## EXHIBIT A

## AFFIDAVIT OF MATTHEW RIPORTELLA

I, Matthew Riportella, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"). I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. §2510(7), and I am empowered by law to conduct investigations of and make arrests for offenses enumerated in that section.

2. I joined the FBI in June 2012. Since November, 2012, I have been assigned to the Organized Crime Task Force of the FBI's Boston Division.

3. I have received extensive training in narcotics enforcement and illegal gambling and organized crime investigations, that included: twenty-one (21) weeks of basic training at the FBI Academy in Quantico, Virginia, which included approximately three weeks of training related to organized crime and drug investigations; a class on financial crimes and money laundering; and numerous hours of on-the-job training in illegal gambling and organized crime investigations. I have a money laundering seminar, which instructed us as to how criminals launder the proceeds of criminal activity so we would know what signs to look for as well as a seminar relating to illegal video poker machines.

4. As an FBI Special Agent, I have participated in investigations relating to illegal gambling and bookmaking. I am aware of different ways that bookmakers accept bets from their bettors, how the bets are recorded and monitored, and the different ways money is exchanged between bookmaker and bettor.

5. In particular, I am familiar with the means and methods by which bookmakers can have bettors place bets either over the telephone or via websites that the bookmaker can then

review from an Internet-connected computer and either pay or collect money from a bettor depending on the outcome of the bettor's wager. I am also familiar with the process that bookmakers rely upon to pay the operators of those websites so that the bookmakers can continue to use them.

6. I have debriefed, and continue to debrief, defendants, informants, and witnesses who have personal knowledge about the operation of illegal bookmaking groups in Massachusetts.

7. Many of the gambling and money laundering investigations that I have participated were national in scope, and many required me to work closely, and to share information and intelligence, with members of other federal, State, and local law enforcement agencies, including the Massachusetts State Police ("MSP"), the Boston Police Department, and the United States Attorney's Office for the District of Massachusetts.

8. As an FBI Special Agent, to further my investigations, I have used various investigatory tools and techniques, including confidential informants, cooperating witnesses, undercover agents, physical surveillance, search warrants, telephone toll analysis, court-authorized electronic surveillance, grand jury investigations, and witness interviews. I am familiar with the benefits and limitations of these techniques.

9. I have participated in the execution of search warrants resulting in the seizure of bookmaking ledgers and related paper work, both physical and electronic; United States currency; records of monetary transactions; bettor lists and other documents relating to illegal gambling; and computers, cell phones, and other electronic devices used in the conduct of illegal gambling businesses.

10. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following assets:

    a. $1,995.75 in United States currency, seized from Michael Bucaria on March 5, 2015;

    b. $30,000 in United States currency, seized from Michael Bucaria on March 5, 2015; and

    c. $134,430 in United States currency, seized from Michael Bucaria at 200 Stuart Street, Boston, Massachusetts, on March 5, 2015

(collectively, the "Defendant Currency").

11. As set forth below, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

12. I further have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), as property, constituting or derived from, proceeds traceable to illegal gambling in violation of 18 U.S.C. § 1955, and pursuant to 18 U.S.C. § 1955(d), as property used in violation of 18 U.S.C. § 1955.

13. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Defendant Currency.

## I. Introduction: Organized Illegal Gambling

### A. Illegal Gambling Operations

14. Through my training, experience, and personal knowledge of illegal gambling activities, I am familiar with the usual structure and operation of gambling organizations. Typically, the structure of a gambling organization is that of a pyramid with differing layers.

While gambling organizations vary from place to place, a typical illegal gambling organization has the following structure:



a. The bottom level tends to consist of numerous persons commonly referred to as "street bookies." "Street bookies" are individuals who in exchange for some sort of consideration, register wagers from the general public and send them to a "local bookmaking office."

b. The second level tends to consist of "local bookmaking offices" and "agents." These "local bookmaking offices" register and consolidate all the wagers they receive from the "street bookies," and in turn, pass the wagers on to an "area bookmaking office." The "agents" are individuals who in exchange for some sort of consideration, register wagers, typically in amounts substantially larger than those from the general public, for a select number of people and forward such wagers to an "area bookmaking office."

c. The third level tends to consist of what is commonly referred to as an "area bookmaking office," which covers a particular geographical area and a particular operation. "Area bookmaking offices" also "lay-off" or bet a portion of its business to other "area bookmaking offices" typically in different geographical areas and operations. These "lay-offs" frequently is done in an effort to balance the books, or to decrease the difference in the amounts wagered on any one particular sports contest or game, thus minimizing the payout to be made and maximizing the revenues to be retained. "Area bookmaking offices" thus consolidate the wagers and wagered amounts from the "local bookmaking offices" and "agents" and make them available to the "person in charge."

d. The top level consists of what is commonly referred to as the "person in charge" or leader. The "person in charge" is responsible for the day-to-day operation of the organization, including activities the following:

1. Laying off of excess amounts of wagers and balancing of books between various "area bookmaking offices" typically in different geographical areas and operations;

2. Collection and payment of money owed as a result of wagers;

3. Collection of past due debts and issuance of credit as a result of past or future wagers;

4. Making arrangements for loans to enable persons to make payments for debts incurred as a result of wagers; and

5. Organizing and maintaining general security for the organization, its assets, and interests.

15. In my training and experience, bookmaking operations are cash businesses because cash transactions help to thwart law enforcement detection and help to make tracing proceeds of illegal proceeds very difficult. Bettors and bookmaking organizations almost always satisfy their gambling debts in cash payments. Individuals associated with the operation of bookmaking offices often possess, or have readily access to large amounts of money. Because individuals participating in bookmaking activities often deal with cash transactions greater than $10,000, they typically store their cash in secure areas in an attempt to avoid the federal currency transaction reporting requirements.

16. Through my training, experience, and knowledge of illegal gambling and conspiracies, a substantial number of searches executed in connection with illegal gambling enterprises, the following kinds of evidence have been recovered: (a) books, records, receipts, notes, ledgers, wagers, and other papers relating to the operation of an illegal gambling business; (b) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the gambling operation, including bettors; (c) cash, currency, and records relating to bets placed and collected, income from gambling

activity, and the expenditure of wealth; and (d) specially manufactured hidden compartments used to store cash or currency used to place bets or constituting the proceeds of illegal gambling.

## B. State and Federal Gambling Offenses

17. Pursuant to 18 U.S.C. § 1955, it is unlawful to "conduct[], finance[], manage[], supervise[], direct[], or own[] all or part of an illegal gambling business." Section 1955(b)(1) defines an "illegal gambling business" as a gambling business that

> (i) is a violation of the law of a State or political subdivision in which it is conducted;
>
> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
>
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

Section 1955(b)(2) defines "gambling" as including but not limited to "pool-setting, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein."

18. Gambling is illegal in the Commonwealth of Massachusetts. *See* M.G.L. ch. 271, §§ 5, 5A, 16A, 17, and 17A.

## II. Overview of the Investigation

19. Beginning in December 2014, the FBI commenced an investigation into money laundering and gambling activities in and around Boston, Massachusetts. In connection with this investigation, on March 5, 2015, the Defendant Currency was seized from Michael Bucaria ("Bucaria"), who was identified during our prior surveillance as being involved in money laundering and gambling. We also learned of Bucaria's involvement through a confidential source (the "CS"), who is an associate of a Boston bookmaker.

20. On September 18, 2014, the CS reported to the FBI that Boston area bookmakers utilize the website www.clickngamble.com, which, in essence, takes the place of a ledger. Rather than accepting bets directly from gamblers, bookmakers have their gamblers place bets through a designated account on the website. The bookmakers can review and accept bets online and use the website to track the results of the bets at the conclusion of the sporting event on which a wager was made. The website also notified the bookmaker and each gambler with the results of the wager and the amount of money owed, and by whom, through a website accessed by the bookmaker.

21. The website operator charges each bookmaker a monthly fee for use of the website, which is assessed per gambler. A bookmaker is charged a fee ranging from $10 to $15 per gambler, and is dependent on several factors, such as the number of gamblers, or whether gamblers place their wagers exclusively online. A bookmaker is charged a higher fee per gambler if the gamblers also place wagers by telephone.

22. The CS reported that there was an employee of www.clickngamble.com named "Vito," who I was later able to identify as Bucaria. The CS reported that Vito takes the train from the New York or the New Jersey area to Boston once a month during the National Football

7

League season. The CS described "Vito" as a heavy set male, who always stays at the Revere Hotel in Boston, just south of the Boston Common area. The CS also explained that "Vito" sits on a chair on the sidewalk smoking a cigar and that the area bookmakers walk up to him with envelopes that contain fees they owe in connection with www.clickngamble.com. Based on this information, I reviewed the records obtained from the Revere Hotel, formerly called the Radisson, and confirmed that Bucaria stayed at the hotel in February, March, April, June, August, September, October, and December 2014, each time staying for two to three nights.

23. On December 3, 2014, the CS reported that "Vito" was planning another trip to the Boston area and would be arriving at the Revere Hotel on December 4, 2014. The CS also reported that "Vito" was planning to meet with area bookmakers on December 5, 2014. Based on this information, I reviewed the records obtained from the Revere Hotel and confirmed that Bucaria checked into the hotel on December 4, 2014, and checked out on December 6, 2014.

24. The CS also provided law enforcement with Bucaria's cell phone number: 201-957-2504. Since November 29, 2014, this number has been subscribed to Jerry Cockenlocker.[1] Based on my review of call records, this number has been in contact with a number subscribed to Anthony "Butchie" Tammaro, an individual known to law enforcement to be a bookmaker.

---

[1] Based on information we have received during the course of this investigation, this name appears to be fictitious.

25. On December 5, 2014, the FBI commenced surveillance at the Revere Hotel and saw a dark colored SUV, bearing Massachusetts registration number 31AS26, arrive in front of the hotel. Based on information provided by the Massachusetts Registry of Motor Vehicles, the vehicle was registered to John Manning, IV, who I knew to be a bookmaker from a prior investigation. A middle-aged, heavy set man wearing a New York Yankees jacket, blue jeans, and white shoes walked up to the passenger side of the vehicle and started speaking with the driver. Based on my review of a New York Registry of Motor Vehicles driver's license photograph of Bucaria, I identified the individual as Bucaria.

26. After speaking with the driver of the SUV, Bucaria walked to the Rock Bottom Restaurant and sat at a table. While inside the restaurant, Bucaria checked two different cellular telephones, one, which was a flip-style phone, and another, which was a smartphone. It also appeared as though Bucaria was reviewing a list, which he retrieved from his pocket, and we saw him put two lines through an item or items on the list. Approximately 30 minutes later, Bucaria left the restaurant and returned to the hotel, where we saw him lean against the front wall, smoking a cigar.

27. Later in the afternoon, Alfred Stankus ("Stankus"), an individual also known to law enforcement to be a Boston area bookmaker, and another individual arrived at the Revere Hotel in a brown sedan. Stankus met with Bucaria, who was standing outside the hotel. Stankus had a priority mail envelope in his hands, which he handed to Bucaria. At the end of their meeting, Stankus went back to his car and left the area. Bucaria, carrying the priority mail envelope in his hands, went into the hotel. The CS, subsequently reported to law enforcement that the priority mail envelope contained over $10,000 in United States currency for Stankus's fees in connection with clickngamble.com.

28. Approximately 30 minutes later, Bucaria returned to the sidewalk in front of the hotel without the priority mail envelope. Law enforcement then saw him using a cellular telephone. Shortly thereafter, a blue BMW convertible, bearing Massachusetts registration number RS89CS (the "BMW"), arrived near the hotel and parked along the side of Stuart Street. According to the information found in the Massachusetts Registry of Motor Vehicles, the BMW was registered to Martin Nahigian. Bucaria approached the BMW, opened the front passenger door, and sat in the front passenger seat. Law enforcement saw the driver count a stack of, what appeared to be $100 bills, and handed the stack of currency to Bucaria. Bucaria placed the money in his jacket pocket. Approximately 20 minutes later, Bucaria got out of the car, and the BMW left the area.

29. Bucaria then waited on the sidewalk for a few minutes. Shortly thereafter, a white BMW, bearing Massachusetts registration number 1CA668, arrived. According to the information found in the Massachusetts Registry of Motor Vehicles, the vehicle was registered to Anthony Bonfilio. Bucaria walked up to the passenger side of the vehicle and started having a conversation with the driver. After a few minutes, the vehicle left the area, and Bucaria walked into the Revere Hotel and went straight to the elevator.

30. On January 14, 2015, FBI resumed surveillance at the Revere Hotel. At approximately 7:35 p.m., law enforcement saw Bucaria standing outside in front of the Revere Hotel. A dark colored SUV, bearing Massachusetts registration number 31AS26, arrived, which was the same vehicle law enforcement saw on December 5, 2014. Bucaria walked to the passenger side door and started having a conversation with the driver. Law enforcement overheard Bucaria say "six months, I know who I can cover," and "400 dollars a day."

31. Later the same day, another vehicle arrived and parked in front of the Revere Hotel. The driver got out of the vehicle and waited on the sidewalk. Bucaria came out of the hotel and met with the individual, and law enforcement saw the individual place an envelope in the front left pocket of Bucaria's shirt. Bucaria went back into the hotel, and the individual returned to the vehicle and left the area.

32. Law enforcement also saw Bucaria meet another person inside the Emerald Lounge, a bar/night club inside the Revere Hotel. The individual was carrying a red and white envelope that resembled a United States Postal priority mail envelope. Approximately five minutes later, the individual left the area and was not seen carrying the envelope. Bucaria stayed inside the Emerald Lounge.

33. Approximately 20 minutes later, Bucaria met another individual inside the Emerald Lounge for approximately one hour. They, then, left the area together.

34. Law enforcement commenced surveillance again on March 4, 2015, after discovering that Bucaria reserved a room at the Revere Hotel from March 4, 2015, to March 6, 2015, which was confirmed through a review of the records obtained from Revere Hotel. The hotel records indicated that Bucaria was staying in Room Number 2101. During the evening of March 4, 2015, law enforcement saw Bucaria standing outside of the Revere Hotel and saw six different individuals approach Bucaria. These individuals had short conversations with Bucaria. Law enforcement saw at least one of these individuals give an envelope to Bucaria.

35. On March 5, 2015, search and seizure warrants were issued by the United District Court of Massachusetts, giving permission to search Bucaria and his hotel room. (Case Numbers 15-4056-DHH and 15-4057-DHH).

### III. Seizure Of The Defendant Currency

36.     On March 5, 2015, at approximately 6:45 p.m., law enforcement saw Bucaria leaving the lobby of the Revere Hotel. He then got into a Chevrolet Yukon, bearing Massachusetts registration number 86KP67, registered to Geraldine Romano. The vehicle was heading north on Interstate 93.

37.     At approximately 6:55 p.m., two Boston Police Department marked units, along with FBI Task Force Officers Timothy Duggan ("TFO Duggan"), Mark Frenzo ("TFO Frenzo"), and Thomas Murphy ("TFO Murphy") executed a stop of the vehicle on the side of Interstate 93 North.

38.     Law enforcement approached the vehicle, and TFO Duggan informed Bucaria, who was in the passenger seat of the vehicle, that they had federal search warrants to search his person and his hotel room. While law enforcement was speaking with Bucaria, they noticed a large bulge in his jacket pocket. As Bucaria was escorted out of the vehicle and after they asked him if he had any weapons on him, Bucaria became agitated and attempted to turn his body away from them. Law enforcement asked Bucaria about the bulge and he responded "What bulge?" For the safety of the officers present, they then unzipped Bucaria's jacket. Bucaria was handcuffed by TFO Cleary and TFO Farley, and a pat down search was conducted based on their observations of the unexplainable bulge in Bucaria's jacket, which allowed them to discover a plastic, white Hard Rock shopping bag that appeared to contain a large amount of United States currency.

39. Law enforcement told Bucaria several times that he was not under arrest and that if he desired, he could be transported back to the Revere Hotel and searched there at the same time as the hotel room. Bucaria agreed to be transported back to the hotel in an unmarked law enforcement vehicle.[2] When law enforcement told Bucaria several times that he was not under arrest, he acknowledged that he understood. Bucaria did not ask for an attorney.

40. Law enforcement also asked the driver of the vehicle for his license. The driver was identified as Christopher Romano ("Romano"). After Bucaria was placed in the transportation vehicle, law enforcement told Romano that he was free to leave.

41. At approximately 7:24 p.m., Bucaria was brought to Room Number 2102, a room directly across from Bucaria's room, and Bucaria was shown a copy of the search warrants. Thereafter, Bucaria was searched, and we found approximately $1,995.75 in United States currency, a New York State license, a Costa Rican license, and four credit/debit cards in the names of Dominick Bucaria, Tindaro Abramo, and Luis Villanova, along with the currency that was found in Bucaria's white Hard Rock bag. When we looked inside the bag, it appeared to contain five stacks of United States currency in $2,000 bands around them, in addition to a sealed white envelope that had "Vito 20K" written on the outside.

42. During the search of the hotel room, we also accessed the safe in the hotel room, and the Revere Hotel staff provided the equipment necessary to open the safe. We found large amounts of United States currency in the safe, totaling $134,430 in United States currency, ledgers, banking documents, postal receipts, a flip style cell phone, and a laptop.

---

[2] Bucaria remained in handcuffs during the drive to the hotel to ensure the safety of the officers. The vehicle Bucaria was transported in did not contain a cage separating the front and rear seats of the vehicle.

43.     At approximately 9:20 p.m., Bucaria was allowed to return to his hotel room. Shortly thereafter, Revere Hotel security staff asked Bucaria to leave the hotel premises. TFO Cleary stayed with Bucaria until he finished packing. We provided Bucaria a copy of the search warrants and a property receipt, and shortly thereafter, Bucaria left the hotel.

## **CONCLUSION**

44.     Based on the information set forth above, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property. I further have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to illegal gambling in violation of 18 U.S.C. § 1955, and pursuant to 18 U.S.C. § 1955(d), as property used in violation of 18 U.S.C. § 1955.

Signed under the pains and penalties of perjury this 18th day of April 2016.

MATTHEW RIPORTELLA
Special Agent
Federal Bureau of Investigation